UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| INAG, INC., a Nevada corporation,<br><br>and<br><br>MARK H. JONES and SHERYLE L. JONES as Trustees of the Mark Hamilton Jones and Sheryle Lynn Jones Family Trust U/A/D November 7, 2013,<br><br>Plaintiffs/Counterdefendants,<br><br>v.<br><br>RICHAR, INC., a Nevada corporation,<br><br>Defendant/Counterclaimant. | Case No. 2:16-cv-00722-RFB-EJY<br><br>**CLAIM CONSTRUCTION ORDER** |

## I.    INTRODUCTION

Before the Court are the proposed claim constructions of the parties for this patent infringement case. The Court's determination of the construction of the disputed terms follows.

## II.    PROCEDURAL BACKGROUND

On March 31, 2016, Plaintiffs filed the current suit against Richar, INC; alleging patent infringement. (ECF No. 1). On June 8, 2016, Defendant brought a separate suit in this court against Plaintiffs in this case seeking to invalidate the same patent at issue in the first-filed case with the same parties. See 2:16-cv-01282-RCJ-CWH. Plaintiffs' amended their complaint in this case on June 27, 2020. (ECF No. 5). After the parties jointly moved to consolidate the two cases, (ECF No. 9), this Court ordered the cases consolidated under the instant case number on August 11, 2016. (ECF Nos. 11, 16). Defendant answered the amended complaint on August 16, 2016. (ECF No. 13). In its answer Defendant asserted that the patent was void, invalid and unenforceable.

Plaintiffs filed their opening claim construction brief on March 20, 2017. (ECF No. 58). The Defendant filed its response on April 17, 2017. (ECF No. 61). The Plaintiffs filed their reply on May 1, 2017. (ECF No. 64). The Court held a claim construction hearing on July 20, 2018. The parties submitted simultaneous supplemental claim construction briefs on August 13, 2018.

The parties notified the Court that Defendant filed an Ex Parte Reexamination ("EPR") petition with the USPTO on October 7, 2019 seeking to invalidate all asserted claims of the patent at issue in this case (U.S. Patent No. 7,669,853 (the "853 Patent")). The USPTO rejected Defendant's primary basis for reexamination.

This order follows.

### III. THE PATENT & ITS HISTORY

Plaintiff INAG, Inc., through its principal Mark H. Jones ("Jones"), conceived a novel machine and method that replicates the excitement of a roulette style game, but uses cards to determine the winning outcome. Jones sought patent protection for this novel machine and method and, on March 2, 2010, the United States Patent and Trademark Office ("USPTO") awarded U.S. Patent No. 7,669,853 ("the '853 Patent") entitled "Card Shuffling Machine" to Jones.

The application leading to the '853 Patent was filed on November 29, 2007 but claims priority to a provisional application disclosing the claimed invention, filed on August 29, 2005. The patent was initially rejected as obvious in light of prior art on February 3, 2009. In a response to this rejection in April 2009, INAG emphasized the novelty of the invention in terms of its disclosure of a "radially outermost stop" for the trays on its turntable and it identified the structure of the "radially outermost stop." See Court Figure A below

/ / /



**Court Figure A** *(copied from '853 patent prosecution history)*

The examiner, however, remained unconvinced and issued a final rejection on July 14, 2009. The examiner again rejected the invention, including the disclosure of the "radially outermost stop" as obvious in terms of prior art. The examiner explained that INAG had not adequately explained how the "radially outermost stop" "provides an advantage" over prior art which performs the "same function." In response to this final rejection, INAG requested on October 8, 2009 that the examiner reconsider this final rejection, arguing that the prior art did not disclose trays or receptacles with a "radially outermost stop." INAG argued that this "radially outermost stop" was a "direct improvement" over prior art. INAG asserted that this 'direct improvement' meant that "no matter what centrifugal forces are applied to the cards [] located in the Applicant's turntable [], they cannot be dislodged by excessive centrifugal forces." The examiner was persuaded by this final argument. In allowing the claims in the Notice of Allowance, the examiner wrote:

> The Examiner agrees with [INAG's] argument that the claimed "the radially outermost stop" prevents cards from being dislodged, and thrown or slid out of the wheel by excessive

centrifugal forces.  Also, the "radially outermost stop" prevents cards from creeping out of their trays, thereby maintaining the cards in an evenly aligned row around the wheel 14. … None of the cited references alone or in combination teach the claimed "radially outermost stop."

Having been persuaded by INAG's arguments, the examiner issued an allowance for all twenty claims of the patent.

The disputed terms in this litigation arise from four claims in the patent. The Asserted Claims containing the disputed terms (in italics) are noted below:

**Claim 1**. A card shuffling machine for singulating a card from among a set of cards in a game of chance, said machine comprising:
  a stationary base for establishing a generally vertical central axis;
  a turntable moveably supported *above* said base for free rotation within a
    generally horizontal plane about said central axis;
    said turntable including a defined plurality of *trays*, said *trays* equally
    circumferentially spaced apart one from another about said central axis,
    each said *tray* including a radially outermost stop;
    said turntable further including a plurality of *dividers*, said plurality of
    *dividers* being equal in number to said defined plurality of trays and spaced
    one from another in equal circumferentially-spaced increments about said
    central axis;
   *a detent fixed relative to said base and operatively interactive with said dividers*,
    said detent effective to apply a pulsating resistance to free rotation of said
    turntable and thereby progressively slow said turntable to a stopped
    condition relative to said base;
  a set of *cards* equal in number to said defined plurality of *trays*, each said *card*
    bearing an indicia related to a decision for a game of chance; and
  one said *card* removably disposed in each of said *trays*, whereby by a
    random one of said *cards* is singulated from said set of *cards* by
    progressively slowing
  a free rotating said turntable to rest through the *interference* of said detent.
**Claim 10**. The *card* shuffling machine according to claim 1 including a pointer fixed relative to said base for indicating one of said plurality of *trays*.
**Claim 16**. A method for playing a game of chance with a rotary card shuffling machine, said method comprising the steps of:
  providing a stationary base for establishing a generally vertical central axis;
    moveably supporting a turntable *above* the base for free rotation within a
    generally horizontal plane about the central axis;
  forming a plurality of trays in the turntable that are equally circumferentially
    spaced apart one from another about the central axis, each *tray* having a
    radially outermost stop;

4

> providing a set of *cards* equal in number to the plurality of *trays*, each *card* bearing an indicia related to a decision for a game of chance;
> removably disposing one *card* in a respective *tray* adjacent its stop;
> providing a bet selection region;
> making a forecast on the outcome of said game of chance by associating a marker on the bet selection region with at least one of many possible game outcomes;
> accelerating the turntable to a *maximum* rotating speed with the *cards* retained in their respective *trays* against the influence of centrifugal forces by the stop at the radially outermost portion of the *trays* and then allowing the turntable to freely rotate about the central axis;
> progressively slowing the free rotating turntable;
> stopping the turntable at a random angular position relative to the base;
> removing at least one *card* from its respective *tray* in response to the random angular position of the turntable relative to the base; and
> announcing a game decision based on the indicia of the at least one card removed from its *tray*.
>
> **Claim 17**. The method for playing a game of chance according to claim 16 wherein said step of announcing a game decision including displaying an image of the one *card* removed from its *tray* on a video monitor.

## IV.   LEGAL STANDARD

A literal patent infringement analysis involves two steps: the proper construction of the asserted claim and a determination as to whether the accused method or product infringes the asserted claim as properly construed. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (in banc), aff'd, 116 S. Ct. 1384, 1393 (1996).

In determining the proper construction of a claim, the court may review various sources for guidance. Vitronics Corp. v. Conceptronic, 90 F.3d 1576, 1582 (Fed. Cir. 1996). These sources include both "intrinsic evidence," e.g., the patent specification and file history, and "extrinsic evidence," e.g., expert testimony. Id.

"It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." Id. (internal citations omitted).

In reviewing the intrinsic evidence, the court first looks to "the words of the claims

1  themselves, both asserted and nonasserted, to define the scope of the patented invention. " Id.
2  "Although words in a claim are generally given their ordinary and customary meaning, a patentee
3  may choose to be his own lexicographer and use terms in a manner other than their ordinary
4  meaning, as long as the special definition of the term is clearly stated in the patent specification or
5  file history." Id.; see also Hoechst Celanese Corp. v. BP Chems. Ltd., 78 F.3d 1575, 1578 (Fed.
6  Cir. 1996) ("A technical term used in a patent document is interpreted as having the meaning that
7  it would be given by persons experienced in the field of the invention, unless it is apparent from
8  the patent and the prosecution history that the inventor used the term with a different meaning.").
9  While "the dictionary can be an important tool in claim construction by providing a starting point
10 for determining the ordinary meaning of a term to a person of skill in the art, the intrinsic record
11 can resolve ambiguity in claim language or, where clear, trump an inconsistent dictionary
12 definition." Kumar v. Ovonic Battery Co., 351 F.3d 1364, 1367-68 (Fed. Cir. 2003)(internal
13 citations omitted). Consequently, "a patentee is free to be his or her own lexicographer and thus
14 may use terms in a manner contrary to or inconsistent with one or more of their ordinary
15 meanings." Hormone, 904 F.2d at 1563.

16       As an inventor may be their own lexicographer, "it is always necessary to review the
17 specification to determine whether the inventor has used any terms in a manner inconsistent with
18 their ordinary meaning. The specification acts as a dictionary when it expressly defines terms used
19 in the claims or when it defines terms by implication." Vitronics Corp, 90 F.3d at 1582. "[C]laims
20 must be read in view of the specification, of which they are a part." Markman, 52 F.3d at 979.
21 Thus, the "specification is always highly relevant to the claim construction analysis." Vitronics
22 Corp, 90 F.3d at 1582.  However, "the specification cannot support a definition that is contrary to
23 the ordinary meaning of a claim term unless it communicates a deliberate and clear preference for
24 this alternative definition. Apple Computer, Inc. v. Articulate Sys., Inc., 234 F.3d 14, 21 n.5 (Fed.
25 Cir. 2000)(internal citations omitted).

26       The court may also consider the prosecution history of the patent. Markman, 52 F.3d at
27 980. "The prosecution history limits the interpretation of claim terms so as to exclude any
28

1 | interpretation that was disclaimed during prosecution." Southwall Tech., Inc. v. Cardinal IG Co.,
2 | 54 F.3d 1570, 1576 (Fed. Cir. 1995).

Importantly, courts construing claims should not "import" limitations from the specification into the claim. Am. Piledriving Equipl, Inc. v. Geoquip, Inc., 637 F.3d 1324, 1331 (Fed. Cir. 2011). "The patentee is entitled to the full scope of his claims," and courts should not "limit him to his preferred embodiment." Kara Tech, Inc. v. Stamps.com Inc., 582 F.3d 1341, 1348 (Fed.Cir. 2009).

## V. CLAIM CONSTRUCTION

### A. Undisputed Terms

After the Markman hearing, the parties submitted supplemental briefs. The Court considers these supplemental submissions along with the record and finds the following terms are no longer disputed: "above," "interference," "card(s)," and "detent fixed relative to said base and operatively interactive with said dividers." These terms shall be given their plain and ordinary meaning.

### B. Disputed Terms[1]

The following terms are disputed. The Court shall construe these disputed terms.

#### 1. "Tray"

| *Disputed Term* | *Plaintiffs' Proposed Construction* | *Defendant's Proposed Construction* | *Court's Ordered Construction* |
|---|---|---|---|
| "Tray" "Trays" | "an open receptacle sized to receive and hold a card" | "slots for loosely holding cards" | "a semi enclosed receptacle sized to receive and hold a card" |

The Court finds that the proper construction for the term "tray" is a "semi enclosed receptacle sized to receive and securely hold a card."

The Court rejects the proffered construction of Plaintiffs as divergent from and broader than what was disclosed and allowed in the '853 patent. An "open receptacle" is essentially another

---

[1] The Court does not find that it need rely upon any extrinsic evidence for interpretation of any of the disputed terms.

1  way of asserting the plain and ordinary meaning for a tray. A tray is defined in the dictionary as
2  an "an open receptacle with a flat bottom and a low rim for holding, carrying, or exhibiting
3  articles." See Merriam Webster Dictionary (https://www.merriam-webster.com/dictionary/tray -
4  last viewed July 15, 2020). This definition ignores the essential securing function of the "radially
5  outermost stop" which is a feature of or integrated into the tray in the invention. Indeed, INAG
6  was able to overcome the examiner's final rejection of the patent by convincing him that the
7  "radially outermost stop" disclosed in the patent represented an 'improvement" over the trays,
8  clamps and other clasping devices used for cards in the prior art. INAG identified the "radially
9  outermost stop" in its initial response to the first rejection of the patent. See Court Figure A, supra.
10 And the patent teaches a tray or receptacle that secures the card "without the use of fastening
11 devices, spring clips, or any other fixation medium." ('853 Patent 3:51-53). INAG's explanation
12 to the examiner and the figures and language in the specification teach a partially enclosed
13 receptacle as part of or integrated with the "radially outermost stop."  As INAG explained, the
14 "radially outermost stop" permits the card in the receptacle to remain in place regardless of any
15 "excessive centrifugal forces" that may occur during the spinning of the turntable. The
16 specification and the prosecution history do not suggest a simple "open receptacle," like a tray, as
17 such an open receptacle would be subject to the slippage and dislodgement the invention was
18 intended to address. Rather, the examiner allowed the patent based upon the novelty of the
19 "radially outermost stop" integrated into the tray or receptacle, noting that "the claimed 'radially
20 outermost stop' prevents cards from being dislodged, and thrown or slid out of the wheel by
21 excessive centrifugal forces." This term must therefore be limited based upon this prosecution
22 history. Southwall Tech., Inc., 54 F.3d at 1576. The Court finds that the specification teaches a
23 receptacle which is more enclosed in order to secure and hold the card against "excessive
24 centrifugal forces." The Court's construction is thus consistent with the specification and
25 prosecution history of the invention.
26     The Court rejects Defendant's proffered construction as unnecessarily limiting. While the
27 Court finds that the disclosed "radially outermost stop" reflects a partially enclosed receptacle
28 capable of receiving, holding and securing a card, it does not find that such a disclosure is limited

to a "slot." A "slot" is defined in its ordinary meaning as a "narrow passage or enclosure." See Merriam Webster Dictionary (https://www.merriam-webster.com/dictionary/slot#:~:text=%5C%20%CB%88sl%C3%A4t%20%5C-,Definition%20of%20slot,a%20narrow%20passage%20or%20enclosure) (last confirmed July 15, 2020.). The Court does not find that the aforementioned prosecution history limits the term in this way. Moreover, while the specification discloses embodiments which disclose what appear to be slots, INAG is not limited to the embodiments in the specification. Kara Tech, Inc., 582 F.3d at 1348. The Court's construction is the broadest construction of the term which is still consistent with the intrinsic evidence.

### 2. Dividers

| *Disputed Term* | *Plaintiffs' Proposed Construction* | *Defendant's Proposed Construction* | *Court's Ordered Construction* |
|---|---|---|---|
| "Dividers" | "structures equal in number to the trays and configured to interact with the detent" | "upstanding peg-like articles positioned to angularly divide the turntable" | "structures equal in number to the receptacles and configured to interact with the detent" |

The Court finds that the proper construction of the term "dividers" is "structures equal in number to the receptacles and configured to interact with the detent." The Court is persuaded that the Plaintiffs' proffered supplemental construction is the most appropriate for this term. This construction addresses the Court's concern that the plain meaning of the term did not disclose the interaction between the dividers and the detent that is taught in the patent.

The Court finds that the Defendant's proposed construction unnecessarily limits the claim in this case. While the various embodiments of the '853 patent disclose upright peg-like structures, the Court does not find that the intrinsic evidence supports such a limitation of this term. The patent's claims do not limit the term in this fashion, and the patentee should not have its claims limited by the patent's disclosed embodiments. Kara Tech, Inc., 582 F.3d at 1348.

### 3. *Maximum*

| *Disputed Term* | *Plaintiffs' Proposed Construction* | *Defendant's Proposed Construction* | *Court's Ordered Construction* |
|---|---|---|---|
| "maximum" | "a rate sufficient to achieve a random outcome" | "greatest value attainable" | "a rate sufficient to achieve a random outcome" |

The Court finds that the proper construction of the term "maximum" is "a rate sufficient to achieve a random outcome." This construction is consistent with the specification. The patent discloses a "machine for singulating a card from among a set of cards in a game of chance." '853 Patent 1:13-14. This machine therefore necessarily involves an element or mechanism for randomness as a game of chance. This randomness is created in part by the rate of speed of the turntable and its subsequent deceleration by its interaction with the detent: "[b]y this machine, a random one of the cards is singulated from the set of cards by progressively slowing the freely rotating turntable to rest through the interference of the detent." Id. at 2:2-5. Thus, the turntable must be spun at a speed sufficient to create the random singulation of the card taught in the invention of this game of chance.

The Court rejects the Defendant's proffered construction as contrary to the entirety of the specification. The term "maximum" must considered in light of "the specification, of which [it is] a part." Markman, 52 F.3d at 979. While the ordinary meaning of the term may suggest the Defendant's proffered construction, this is clearly contrary to the meaning of the term "impli[ed]" in the specification. Vitronics Corp, 90 F.3d at 1582. The patent discloses a game of chance based upon a spinning turntable, yet nowhere does the specification discuss varying rates of speed of the turntable or a set speed for the turntable. The patents various disclosures discussing the spinning of the turntable occur in conjunction with the disclosure of the slowing of the turntable to randomly select a card or game indicia. Patent '853 1:13-17, 2:2-5, 6:64-66, 7:2-6, 7:13-14. These disclosures are not directed to attaining a particular speed or ever-increasing speed. They are directed to attaining a sufficient speed to allow for the detent to interact with the dividers to slow the turntable to randomly identify a game card. This interpretation is further supported by the specification's indication that various means or structure may be used to create the rotational speed

of the turntable. Id. at 7:2-6. Consequently, the Court finds the Plaintiffs' proffered construction to be supported by the specification.

### VI. CONCLUSION

**IT IS THEREFORE ORDERED** that the terms in the Asserted Claims shall be construed as delineated in this order.

**DATED**: July 16, 2020.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**